MAESEL SHEPARD, Claimant, Appellant, v. CARNATION MILK COMPANY, Employer, and JENS MURRAY & COMPANY et al., Insurance Carriers, Appellees.

No. 42984.

JULY 17, 1935.

REHEARING DENIED OCTOBER 17, 1935.

Reed, Beers & Graham, for claimant.

McCoy & Beecher, for defendants.

POWERS, J.—When the injury complained of herein was sustained, the employee, V. V. Shepard, a married man, thirty-eight years of age, was engaged in the course of his employment in delivering milk for the Carnation Milk Company to Bishop's Cafeteria in Waterloo. He entered the back door of the cafeteria with a tray of milk bottles in his right hand. As he entered, he passed directly in front of a refrigerator which was, in fact a refrigerating room and equipped with a door of sufficient size to permit the entrance of employees. The door was six or seven inches thick. An employee of the Bishop Cafeteria Company had previously entered this refrigerating room for the purpose of obtaining some provisions. When leaving the room, both his hands were occupied in holding provisions which he was carry-

ing. He opened the door by backing up against it, and by action of his hips lifting the bar that held the door closed and then with his buttocks forcing the door open. The testimony tends to show that this was done with considerable violence, probably on account of the fact that the door was heavy and fit tightly, and the additional fact that there was a heavy spring which caused the door to close automatically when opened, and the employee desired to open it sufficiently wide to permit him to leave the refrigerating room with the provisions which he had in his hands before the door would be swung shut again by the operation of the spring. On the outside of the door was a metal handle. As the door swung open, the metal handle struck Shepard, who was then in front of the door, on the left side about midway between the lower rib and the crest of the hip bone and knocked the wind out of him. He sat down for about five minutes, after which he cleaned up the mess resulting from some of the milk bottles which he had been carrying being broken and proceeded with his work. This was about the first day of June, 1932. He noticed no particular pain at the point of the impact at the time. Within about a week, however, he began to experience pain at the point where the blow was received, and at the end of two weeks the pain developed to such an extent that he quit work and consulted a physician. The physician found an abscess just under the skin at the place where the blow was received. This he later drained. The abscess continued to drain for a period of some two or three weeks, when fecal matter began to appear, and it developed that Shepard was suffering from cancer of the colon described as of the napkin ring variety; that is, one which entirely encircles the colon. He suffered no inconvenience, and was not aware there was anything the matter with him before receiving the blow. He died on the 13th day of November following, as a result of the growth of the cancer.

V. V. Shepard filed a claim for compensation but died while the claim was pending. His widow was thereafter substituted as claimant. The arbitration committee awarded compensation. An appeal was taken by the employer and insurance carrier to the industrial commissioner, who affirmed the arbitration award, allowed compensation, and found that, while cancer may have existed before the blow was received, it was aggravated by the blow and caused to develop more rapidly than it otherwise would

have, and by reason thereof the employee's disability and death were hastened on account of the blow. On appeal, the district court reversed the industrial commissioner on the ground that the findings of the industrial commissioner were not sustained by sufficient competent evidence.

No question is involved here as to the sufficiency of the findings of the commissioner to sustain the order. In other words, it seems to be conceded that, if the blow received by the workman did, in fact, aggravate a cancerous condition and cause the cancer to grow more rapidly and produce disability and death sooner than it otherwise would, the injury is compensable. See Slack v. C. L. Percival Co., 198 Iowa 54, 199 N. W. 323; Hanson v. Dickinson, 188 Iowa 728, 176 N. W. 826; Belcher v. Des Moines Electric Light Co., 208 Iowa 262, 225 N. W. 404. There is no question raised here, either, as to the competency of the evidence received and considered by the industrial commissioner. The only question is whether the evidence received was sufficient to sustain the finding that the injury accelerated the growth of the cancer and produced disability and death sooner than it otherwise would have occurred.

In the consideration of this question, the limitation upon the power of the court in compensation cases must be kept clearly in mind. The purpose of the enactment of such legislation was to avoid litigation, lessen the expense thereof, and afford an efficient and speedy tribunal to determine and award compensation. Flint v. City of Eldon, 191 Iowa 845, 183 N. W. 344. To that end the act provides that, in the absence of fraud, the findings of the industrial commissioner on the facts are conclusive. The act contemplates that all controversy over disputed questions of fact shall end with the findings of the industrial commissioner. Section 1452, Code 1931. It is not the province of the court to review the evidence and determine whether or not it believes that the industrial commissioner reached a correct conclusion on the facts. We may well repeat here what we said in the case of Flint v. City of Eldon, supra, by way of quotation from a New York case (Rhyner v. Hueber Bldg. Co., 171 App. Div. 56, 156 N. Y. S. 903):

"It was the purpose of the legislature to create a tribunal to do rough justice—speedy, summary, informal, untechnical. With this scheme of the legislature we must not interfere; for,

if we trench in the slightest degree upon the prerogatives of the commission, one encroachment will breed another, until finally simplicity will give way to complexity, and informality to technicality.''

The task of the court is to enforce this legislative scheme, not to interfere with it. If, therefore, there is evidence from which the industrial commissioner could have found as he did, the court must not interfere with such findings. Section 1453, Code 1931. This brings us to a consideration of the testimony offered in support of the claim.

Dr. Carl Bickley, who was the workman's attending physician, testified:

''Q. With the history that he made of it and knowing his condition, would you say that blow received as was described in the history on June 1st, 1932, would aggravate or light up a cancerous growth, such as you found there after you entered the abscess? A. The severe blow over that particular area would surely aggravate a situation like that.''

His further testimony may be abstracted as follows:

Knowing this man's history and the situation, his physical condition, and the treatment given, in my opinion that blow probably caused this man's death sooner than he would have died had he not received the blow.

''The cancer in this case was a so-called napkin ring cancer, which forms around the bowel. It would not necessarily be very large to restrict the bowel movement and give earlier symptoms than when the growth is all on one side. With the napkin ring cancer the first symptom would be persistent constipation caused by gradual blocking and later on, as the tumor itself began to degenerate, then discharges would appear in the stool. Sometimes the bowel is completely obstructed as one of the first symptoms of the carcinoma of the lower bowel. I concluded, from the fact that none of the symptoms had been apparent, that for some reason or other the carcinoma of the sigmoid colon had been aggravated and developed more rapidly than it otherwise would. That is my judgment.''

In my opinion Shepard might have lived another eight months if he had not received that blow.

Dr. J. R. Thompson, a physician and surgeon, testified: The blow would aggravate any condition that happened to be there, whether cancerous or otherwise.

"Sometimes when a cancer is operated on, instead of aiding the situation, it develops it and causes it to grow faster. That is traumism, the same as the blow. Doctors hesitate to cut into a cancer for fear it will aggravate it and cause death sooner. The effect is the same as the blow such as has been described here. I am not able to tell how much the blow may have shortened the life of this man.

"Q. But it is your opinion, doctor, that such blow would have aggravated it. A. Certainly."

In addition to the foregoing, there was the physical fact that the abscess developed just under the skin at the point where the blow was received. It appears from this reference to the testimony in support of the claim that there was this physical fact which would justify an inference that there was some connection between that blow and the abscess, and, in addition, two experts, concededly competent, who gave it as their opinion that the blow received by the workman in this case accelerated the growth of the cancerous condition and thereby caused the death of the workman sooner than it otherwise would have occurred as a result of the cancer. That is what the industrial commissioner found. How can it be said then that such finding is without support in the evidence?

It is claimed on behalf of appellee that these experts were not certain; that is, that they could not tell the exact number of days which the workman would have lived had he not received this blow. It is claimed that this was necessary, in view of the undisputed fact that the workman had a cancer when the blow was received and that this cancer would have ultimately caused death in any event. Because of this inability of the experts to give a definite time, it is claimed they were merely guessing or speculating. If such inability is to disqualify the experts in this case, such a test would disqualify them in every case where death results from injury. We are all doomed to death. If a doctor testifies that a certain injury caused the death of a person to occur when it did occur, is his testimony to be entirely discredited because he is unable to state the exact number of days, or even the approximate time, which the person would have lived

had he not received the injury? In the one case, the expert is dealing with things which have happened. In the other he is asked to forecast the things which will happen. The duration of life is always uncertain. It is dependent on many factors, some of which are, in the nature of things, unknowable. To expect medical experts to tell the day on which a person would die in the absence of accidental injury is to seek to endow them with magic and convert them into sorcerers. It is sufficient if the doctor is able to say that death occurred when it did because of the injury. He is not required to enter the realm of speculation and forecast when death would have occurred if it had not been for the injury.

In this same connection, it is claimed that the concessions made by the medical experts on cross-examination show that they were merely guessing and speculating. The following from the cross-examination of Dr. Bickley is an example:

"Q. Might it be possible that he would have died on the day he did die if he hadn't received the blow? A. It is possible."

Such an admission is of little significance. Anything is possible. It is possible that the world will come to an end before this opinion is filed. Of course, it was *possible* for the workman to have died the day he did die, in the absence of that blow. We all know that without the doctor having so testified. It is even *possible* that he might have died sooner than he did, if he had not received that blow. He might have kept on working and been killed the next week in an automobile accident. Such speculation does not help us much. We indulge in it merely to show the futility of attempting to attach significance to the statement of a *possibility* when engaged in an effort to determine what actually happened.

If we assume the witness meant, what he did not say, that there was a possibility that Shepard might have died of cancer on the day he did die if he had not received the blow, the most that can be claimed for such an admission is that the doctor admits that there is a possibility that the conclusions he expressed in his direct examination might not be correct. Almost any expert, if he be honest, would make the same admission. The very nature of opinion evidence deprives it of the quality of absolute certainty. If it had that quality, it would not be an opinion.

But the admission of a possibility that an expert opinion might be erroneous does not destroy the effect of the testimony. At most, it goes only to its weight. If we were to require claimants in these compensation cases to establish their claims by evidence so conclusive that it is beyond the possibility of being erroneous in order to support a finding in their favor by the industrial commissioner, we would be exacting a test unknown to the law, and one far more severe than is applied to support a verdict of a jury even in criminal cases where defendant's liberty and perhaps his life are at stake. Juries in criminal cases are not even given a standard as severe as that for use in weighing the evidence. Such a contention, when analyzed, supplies its own refutation. When an expert expresses his opinion as to the *probabilities*, especially when he supports such opinion by the reasons for his conclusion, his testimony is entitled to consideration and such weight as the trier of fact thinks it deserves, even though such expert admits the *possibility* of his being in error. See Jones v. Eppley Hotels Co., 208 Iowa 1281, 227 N. W. 153.

The trial court, in reversing the commissioner, seems to have regarded the opinions expressed by the doctors as sufficient to support the findings of the commissioner, but found that the doctors based their opinions upon the workman having received a severe blow, whereas the evidence failed to show that the blow was severe. Nowhere in the record were either of the doctors asked to express an opinion based upon a hypothesis contained in the question which described the blow as being a severe blow. Dr. Bickley, in the question and answer which we have heretofore set out in this opinion, was asked to express his opinion based on the nature of the blow as he got it from the history of the case and his personal examination of the patient. There was no objection to the question in that form, and to that question the doctor made the answer that "the severe blow over that particular area would surely aggravate a situation like that." Moreover, Dr. Bickley shows by his testimony that his opinion that the growth of the cancer was aggravated is based more upon the course of the development of the cancer, its departure from the normal stages of growth, than upon any information as to the severity of the blow.

We are cited to the cases of Slack v. C. L. Percival Co., 198 Iowa 54, 199 N. W. 323, and Guthrie v. Iowa Gas & Electric Co., 200 Iowa 150, 204 N. W. 225, in which this court held that the

evidence was insufficient to support the findings of the commissioner. The legal proposition laid down in both those cases is that expert testimony to the effect that the injury *might* or *might not* have aggravated the disease does not raise an issue for the industrial commissioner to determine. With that legal proposition there can, of course, be no quarrel. The testimony in this case, however, as we have set it out above, rises much higher than that and contains the definite opinion of the experts that it did aggravate the condition.

Under the record in this case, we are convinced that there was evidence before the industrial commissioner from which he could find that the blow received by the workman aggravated the cancerous condition from which the workman was then apparently suffering and caused the cancer to light up and grow and develop much more rapidly and cause disability and death much sooner than it otherwise would. Under such circumstances, the court cannot properly interfere with finding to that effect by the commissioner. It follows that the trial court was in error in reversing the commissioner, and that this cause must, on that account, be reversed.—Reversed.

KINTZINGER, C. J., and ALBERT, ANDERSON, DONEGAN, PARSONS, HAMILTON, and RICHARDS, JJ., concur.