R. L. BOSWELL, Claimant, Appellant, v. KEARNS GARDEN CHAPEL FUNERAL HOME, Employer, and NATIONAL CASUALTY COMPANY, Insurance Carrier, Appellees.

No. 44954.

NOVEMBER 14, 1939.

F. W. Edwards, for appellant.

P. H. Frank, for insurance carrier appellee.

HAMILTON, J.—R. L. Boswell was an employee of Kearns Garden Chapel Funeral Home. The National Casualty company was the insurance carrier. Boswell had a ringworm infection on his left hand which had been of long standing. It would flare up from time to time, get better and then become worse. In July, 1937, it had one of these flare-ups at which time Dr. Ridenour of Waterloo, Iowa, was called. The doctor treated him for some time during which time the irritation, which is referred to as dermatitis, would get a little better and then become a little worse. In January, 1938, they had a general housecleaning at the funeral parlors in which commercial cleaning compounds, caustics, soap and commercial wall paint cleaner were used. Part of Boswell's duties involved the use of such compounds, etc., in cleaning up the preparation room where bodies are prepared for burial and embalming. Shortly after this house-cleaning operation, his hand "became swollen and pussed" and very painful and was so bad that he was unable to work from the 25th of January to the latter part of April. Dr. Smith was called in to look at the hand. Smith sent Boswell to the Allen Memorial hospital in Waterloo, Iowa, where he remained for about a week, and, thereafter, Dr. Smith treated the hand for several days and finally directed Boswell

to a skin specialist, Dr. Normland, at the State University hospital, who examined the hand and gave claimant some medicine and directed him to resume his treatments with Dr. Smith, who continued to treat Boswell until the claimant was able to go back to work the following May. Plaintiff Boswell commenced his action by filing his claim with the Iowa industrial commissioner, predicated on a dermatitis infection to his left hand which he alleged had arisen out of and in the course of his employment. Appellees' defense was a general denial that such injury arose out of and in the course of appellant's employment and that the alleged condition of claimant's hand was in no way attributable to his employment. There was an award of compensation by the deputy industrial commissioner which, on review, was affirmed by the commissioner. On appeal, the district court reversed the commissioner and claimant has appealed.

There is but one question involved, namely: Was there evidence showing causal connection between the condition complained of and the alleged infection?

■ The burden of proof, of course, rests upon the employee to establish his case by a preponderance of the evidence.

■ Where the facts are in dispute, the court ordinarily refuses to disturb the finding of the commissioner, but, where the facts are not in dispute, the court may review the conclusion of the commissioner based upon such undisputed facts for the purpose of determining whether or not there is sufficient competent evidence in the record to support the commissioner's decision. Guthrie v. Iowa Gas & Elec. Co., 200 Iowa 150, 204 N. W. 225; Sparks v. Con. Ind. Coal Co., 195 Iowa 334, 190 N. W. 593.

■ The award may not be permitted to stand if the evidence goes no farther then to show a possibility of causal connection. In other words, as stated in the case of Slack v. Percival Co., 198 Iowa 54, 59, 199 N. W. 323, 326:

"In actions of this character, it is the universal rule that the claimant has the burden to establish by a preponderance of the evidence a right to compensation. In other words, the matter cannot be left wholly to surmise or conjecture. A legal right is involved. It must be established in a legal way, and not by guess or speculation."

Dr. Ridenour, the first physician called to examine the hand, testified that, when he first came, there was a lesion on the back of claimant's hand and down between his fingers, and further stated that:

"It was scaly, inflamed lesion and as I recall I believe there were vesicles and I took it to be ringworm probably associated with dermatitis—there was really no question about the dermatitis which is an inflammation of the skin. After about three treatments it began to clear up and I instructed him carefully how to care for his hand, keep it out of strong solutions of any kind as that invariably makes it worse. You have to be so careful of these conditions as anything that would be the least bit irritating would make it flare up, such as getting the hands in a strong solution of any kind or even by work. * * * you have to keep using the preparation at times or you will have a recurrence of the infection. In the condition his skin was when I was caring for it was very susceptible to infection or germs and would be more liable to infection when doing housecleaning. * * * In all of those cases vesicles are present, and those vesicles fill with pustules and you would say that it is an infection of some kind, but it is merely an irritation from the organism and that is what you always get from ringworm infection. * * * I gave him an ointment to use and told him to keep his hand bandaged or wear rubber gloves as even warm water would cause a flare-up of the chronic condition in a ringworm infection. I did not see the hand after the middle of January."

The house cleaning took place in the middle of January and it was about the 30th of January that Dr. Smith was called. He testified that:

"* * * I examined the hand, found it swollen, indurated, the back of the hand was pustular and he seemed to have some temperature. He gave a history of a chronic skin condition for several months which had flared up shortly which I advised him to use wet packs to clear up the infection. The hand continued in a very bad shape and he developed lymphangitis and I advised him to go to the hospital which he did. * * * The infection would seem to subside and then flare up again * * * From the history Boswell gave of a chronic skin condition, fol-

lowing this the history of the house-cleaning it is possible that he picked up an infection on the super imposed infection of this chronic skin condition. Any skin with a lowered resistance is more subject to infection than a normal skin, in fact any irritation or sore would make infection more susceptible.

"Q. And then, as I understand it, it is your opinion that he had what you would call this infection, a secondary infection? A. You mean the infection that I was treating him for?

"Q. Yes. Or was it the ordinary chronic trouble, that's what we want to know? A. I could not say as to that definitely.

"When I first saw him he had an infected hand which from the history he gave would have to say was super imposed on this chronic condition; the infection was present when I first seen him the latter part of January. There is no question about that, that he had an infected hand. His hand was badly swollen and he had a lot of pain on moving his fingers and I did not see how the man could have worked at his occupation and with a hand of that nature and of course an infected hand that was as badly infected as his would be aggravated by working. * * * We did not culture any organism but from the type of infection he had would call it a streptococci infection which is entirely different from eczema or ringworm. * * * What I mean by lymphangitis is commonly known as blood poisoning * * * Knowing that he had a decreased resistance to infection and with his hand in the condition it was it would be very possible to pick up an infection when cleaning a post mortem room or any room and by 'possible' I mean it could happen. Because of the skin infection which existed there are hundreds of reasons and cause that might have caused this secondary infection."

The foregoing constitutes all of the testimony bearing on the question before us. The legal quest is the cause of this secondary infection. Dr. Smith stated:

"It would be very possible to pick up an infection when cleaning a post mortem room or any room and by 'possible' I mean it could happen. * * * From the history Boswell gave of a chronic skin condition, following this the history of the house

cleaning it is possible that he picked up an infection on the super imposed infection of this chronic skin condition.''

Clearly, this testimony presents nothing but a possibility and we have repeatedly held that this is not sufficient to support an award of compensation. No one else hazards an opinion as to where the infection came from. Appellant does not contend that Dr. Smith's testimony furnishes sufficient basis for recovery. He bases his claim on what Dr. Ridenour said, as follows:

''I instructed him carefully how to care for his hand, keep it out of strong solutions of any kind as that *invariably makes it worse.*'' (Italics ours.)

Appellant argues that, because, following the use of strong solutions in the house-cleaning operation, there developed a swollen, indurated, painful hand that disabled the claimant, there was evidence to sustain the finding of the commissioner. In other words, claimant did the very thing that the doctor said would invariably make his hand worse and, after doing this, the hand did become worse to such an extent that, at the end of approximately two weeks after the house cleaning, Dr. Smith found the secondary infection which disabled the claimant from continuing his work. It will be noticed, however, that even Dr. Ridenour did not say, in fact he was not asked, as to the probability of the secondary infection being caused from the house-cleaning operation nor does he limit the cause of a flareup of this irritation to the use of strong solutions in the house-cleaning operation. He says:

''* * * anything that would be the least bit irritating would make it flare up, such as getting the hands in a strong solution of any kind or even by work. * * * told him to keep his hand bandaged or wear rubber gloves as even warm water would cause a flare-up * * * it was very susceptible to infection or germs and would be more liable to infection when doing housecleaning.''

Dr. Smith said:

''Because of the skin infection which existed there are hundreds of reasons and cause that might have caused this secondary infection.''

The commissioner reasoned as follows:

"The records disclose that claimant rendered service in the way of cleaning the house, with caustic materials, including irritating caustics and soaps and within a very short time following such service the hand did flare up resulting in the condition as found and testified to by Dr. Smith. The question is, whether or not the irritants operating on and with the pre-existing condition may be regarded as the proximate cause of the affliction which caused claimant's disability. Our Supreme Court in the case of Hanson v. Dickinson, 188 Iowa 728 [176 N. W. 823], has said that where an employee, suffering from a pre-existing condition sustains an injury arising out of and in the course of his employment, that operates as a contributing factor, which when operating with pre-existing conditions cause disability, then and in such case such contributing factor is regarded as the proximate or immediate cause resulting in disability and therefore compensable.

"In the case at bar the dermatitis or ringworm affliction did not disable claimant from following his usual work. That following the use of irritating materials the employer's instrumentalities, while rendering service for the employer on the employer's premises, therefore on the record evidence in the case at bar we are constrained to believe and hold that the irritating factors in the work performed in connection with the cleaning of the employer's premises and/or materials used to disinfect instruments which were used in connection with dead bodies can fairly be said to be such irritating factors that produce and caused the disability which Dr. Ridenour testified would likely follow if used."

Dr. Ridenour was speaking of the things that would cause this ringworm infection to flare up—to irritating causes. He did not see the hand after the house cleaning. Dr. Smith, who did examine it and treat it, had the benefit of the history of the chronic infection and also the history of the house cleaning and, in addition, the benefit of a personal examination and he would venture nothing more than the assertion that it was "very possible" and that by "possible" he meant it could happen. Dr. Smith was speaking of the secondary infection which he

found existing the latter part of January when he was called in on the case.

Is this court warranted or was the commissioner warranted in going beyond what the plaintiff's own doctor said and hold that it was not only possible but that it was fairly probable that the secondary infection was caused or had its origin in the use of the caustic materials? The secondary infection here was described as blood poison. The irritation on the hand furnished a very susceptible entrance for other infections such as blood poison but Dr. Smith says it could come from "hundreds" of causes. It seems to us, just as a matter of sound horse sense, that the doctors might have said, from all the circumstances disclosed, that it was very probable the claimant picked up this germ in the house-cleaning operation and had they done so we would have no trouble, but Dr. Smith would go no farther than to say it could have happened. This is not sufficient. We think it logically follows that we may not assume to be more competent experts on this subject than the claimant's own attending physician. Under our holdings, the award must stand on something more than a mere possibility. Neal v. Railway Co., 129 Iowa 5, 105 N. W. 197, 2 L. R. A., N. S., 905; Field v. Southern Surety Co., 211 Iowa 1239, 235 N. W. 571; Phillips v. Briggs, 215 Iowa 461, 245 N. W. 720; Natalini v. Northwestern F. & M. Ins. Co., 219 Iowa 806, 259 N. W. 577; Shepard v. Carnation Milk Co., 220 Iowa 466, 262 N. W. 110; Slack v. C. L. Percival Co., supra; Guthrie v. Iowa Gas & Elec. Co., supra; and Sparks v. Consolidated Indiana Coal Co., supra.

We reach the conclusion that the trial court was right and the case is accordingly affirmed.—Affirmed.

SAGER, MITCHELL, MILLER, HALE, BLISS, and STIGER, JJ. concur.

OLIVER, C. J., and RICHARDS, J., dissent.